## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| COBB COUNTY BOARD OF COMMISSIONERS. | ) ) ) |
|  | ) |
| Plaintiff, | ) CASE NO. _____ |
|  | ) |
| v. | ) |
|  | ) **JURY TRIAL DEMANDED** |
| TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA. | ) ) ) |
|  | ) |
| Defendant. | ) |
|  | ) |

## <u>COMPLAINT</u>

The Cobb County Board of Commissioners, on behalf of Cobb County, files this complaint, alleging as follows:

1.      This is a complaint for breach of contract, bad faith, and declaratory judgment, filed by Cobb County against its insurer, Travelers Property Casualty Company of America ("Travelers").  The County seeks damages and other relief for Travelers' breach of an insurance policy it sold to the County, remedies under Georgia law for Travelers' statutory and common law bad faith, and judicial declarations regarding Travelers' obligations under the insurance policy.

## PARTIES, JURISDICTION, AND VENUE

2.      Plaintiff, the Cobb County Board of Commissioners, acts on behalf of Cobb County (referred to herein as "Cobb County" or the "County"), a political subdivision of the State of Georgia.  Plaintiff is a citizen of Georgia for purposes of 28 U.S.C. § 1332.

3.      On information and belief, Defendant Travelers is a Connecticut corporation with its principal place of business in Hartford, Connecticut at One Tower Square, Hartford, CT 06183.  As a result, Travelers is a citizen of Connecticut for purposes of 28 U.S.C. § 1332.

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1332, 2201 and 2202.  Complete diversity of citizenship exists between the parties, and the amount in controversy is in excess of $75,000 (Seventy-Five Thousand Dollars and no/100), exclusive of interest and costs.

5.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because Travelers resides in this district, and/or 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims herein occurred within this district.

## THE INSURANCE POLICY

6.      Travelers sold the County an "All Risks" Property Insurance Policy bearing Policy No. KTJ-CMB-8J04027-1-18 (the "Travelers Policy" or "Policy").

US1900 9482583 7

A copy of the Travelers Policy is attached hereto as **Exhibit A**.  The period of insurance covered by the Travelers Policy is October 1, 2018 to October 1, 2019. In general terms, the Travelers Policy provides up to $750 million dollars in coverage for losses associated with damage to property, excess of various "retention" (deductible) amounts, depending on the coverage provisions and endorsements that apply.

7.      Under the Travelers Policy, the Cobb County Board of Commissioners qualifies as an Insured because it is the Named Insured in the Travelers Policy.

8.      The Travelers Policy is an "All Risks" property insurance policy, containing a broad coverage grant as follows:

**A.      COVERAGE**

The Company [Travelers] will pay for direct physical loss or damage to Covered Property caused by or resulting from a Covered Cause of Loss.  Covered Causes of Loss means risks of direct physical loss unless the loss is excluded in Section D., Exclusions, limited in Section E., Limitations, or otherwise extended, excluded or limited in this Coverage Form, the Supplemental Coverage Declarations or by endorsement.  The Company will also pay for Covered Costs and Expenses as described in Section B.2.

Ex. A, Property Coverage Form, at p. 10.

9.      As described in greater detail in the Travelers Policy, Covered Property includes, without limitation, Buildings and Business Personal Property.

Ex. A, Property Coverage Form, Section B.1, at pp. 10-14.

10.     Also as described in greater detail in the Policy, Covered Costs and Expenses includes coverage for those items described at Section B.2 of the Property Coverage Form, in the limits that are identified in the Declarations pages. *See* Ex. A, Property Coverage Form, Section B.2, at pp. 14-19.

11.     The Travelers Policy also includes a "Flood" Endorsement, which extends coverage under the Policy and impacts certain exclusions therein. According to the Policy's Declarations, the Flood Endorsement provides up to $50 million in limits.  Under the Flood Endorsement,

A.     The following is added to the Covered Causes of Loss and the "specified causes of loss":

Flood, meaning:

1.     Flood, surface water, underground water, waves (including tidal waves and tsunami), tides, tidal water, overflow of any body of water, or their spray, all whether driven by wind or not (including storm surge); …

4.     Water or sewage which backs up or overflows or is otherwise discharged from a sewer, drain, sump, sump pump or related equipment; and

5.     Waterborne material carried or otherwise moved by any of the water referred to in 1., 3. or 4. above, or material carried or otherwise moved by mudslide or mudflow; all whether naturally occurring or due to man-made or other artificial causes.

All whether naturally occurring or due to man-made or other artificial causes.

Ex. A, Flood Endorsement, at p. 48.

12.     The Property Coverage Form also includes Exclusions, some of which Travelers purports to rely upon to disclaim coverage in this dispute.  *See* Ex. A, Property Coverage Form, Section D at pp. 21-27.

13.     For example, Travelers purports to rely on Exclusion D.3.c.(2), which excludes coverage for loss or damages caused by or resulting from

  c.     Faulty, inadequate or defective …

      (2)     Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction; …

  of part or all of any property on or off the insured premises.

  *But if an excluded cause of loss that is listed in 3.c.(1) through 3.c.(4) above results in a Covered Cause of Loss, this exclusion does not apply to loss or damage caused by that resulting Covered Cause of Loss*.  But the Company will not be liable for:

      (a)     Any cost of correcting or making good the fault, inadequacy or defect itself, except provided for fire extinguishing equipment under Limitation E.3. below;

      (b)     Any cost incurred to tear down, tear out, repair or replace any part of any property to correct the fault, inadequacy or defect, except as specifically provided under the Water, Other Liquids, Powder or Molten Material Damage coverage in Section B.2.k. of this Coverage Form; or

      (c)     Any resulting loss or damage by a Covered Cause of Loss to the property that has the fault, inadequacy or defect until the fault, inadequacy or defect is corrected.

Ex. A, Property Coverage Form, Section D.3.c., at pp. 26-27 (emphasis added).

US1900 9482583 7

14.     With respect to the above exclusion referenced in Paragraph 13,

"Covered Cause of Loss" is defined in the "Coverage" paragraph quoted above to

mean "risks of direct physical loss unless the loss is excluded" under the Policy.

Accordingly, as the County has repeatedly communicated to Travelers, including

in correspondence described below, even if the exclusion were to apply as

Travelers contends, the italicized "give-back" language would still provide

coverage for the County's loss or damage.

15.     Moreover, Travelers purports to rely on Exclusion D.2.c.,

subdivisions (2) and (4), which exclude coverage for loss or damages caused by or

resulting from:

c.      (2)     Rust, corrosion, erosion, decay, deterioration, hidden or
                latent defect or any quality in the property that causes it
                to damage or destroy itself; …

        (4)     Settling, cracking, shrinking bulging or expansion; …

        *But if an excluded cause of loss that is listed in 2.c.(1) through*
        *(7) above results in a "specified cause of loss" or building*
        *glass breakage, the Company will pay for the loss or damage*
        *caused by that "specified cause of loss" or building glass*
        *breakage.* …

Ex. A, Property Coverage Form, Section D.2.c., at p. 24 (emphasis added).

16.     With respect to the above exclusion, "specified cause of loss" is

defined in the Policy Conditions, Additional Provisions and Definitions Form, at

Section D.19, and this definition includes "water damage."  Ex. A, Policy

6

Conditions, Additional Provisions and Definitions Form, Section D.19 at p. 81.

Moreover, "water damage" is defined in the Policy Conditions, Additional

Provisions and Definitions Form, at Section D.26 as follows:

> a.      Accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of any part of a system or appliance (other than a sump system including its related equipment and parts) containing water or steam. …

Ex. A, Policy Conditions, Additional Provisions and Definitions Form, Section

D.26 at p. 82.

17.      In addition, the Flood Endorsement in the Travelers Policy

specifically adds "Flood" (as described further above) to the meaning of a

"specified cause of loss."  See Ex. A, Flood Endorsement, at p. 48.

18.      Thus, as above, and as the County has repeatedly communicated to

Travelers, including in correspondence described below, even if Exclusion D.2.c.

were to apply as Travelers contends, the italicized "give-back" language in the

exclusion would still provide coverage for the County's loss or damage.

19.      Travelers also purports to rely on the "Pollutants" exclusion appearing

at Section D.2.g. of the Policy.  Ex. A, Property Coverage Form, Section D.2.g., at

p. 25.  As the County has repeatedly communicated to Travelers, including in

correspondence described below, this exclusion does not apply to bar coverage.

7

## THE INCIDENT AT THE INFLUENT LIFT STATION

20.     This lawsuit arises from an incident occurring at the South Cobb Water Reclamation Facility ("SCWRF") in Austell, Georgia, following a project (the "Project") that consisted of design and construction of a 24-foot finished diameter deep rock tunnel approximately 5.7 miles in length (with depths ranging from 150 feet to 400 feet), several other tunnels ranging from 100 to 3,200 feet in length, and an Influent Lift Station (the "ILS"). This project was the largest capital improvement wastewater project in the history of the Cobb County Water System and was intended to increase sewer capacity in the South Cobb County area.

21.     The ILS is primarily an underground building in the shape of a large concrete cylinder. It extends approximately 200 feet deep and houses six 1,500 horsepower centrifugal pumps. A primary purpose of the ILS is to convey liquid sewage (i.e., wastewater) upward from the underground tunnel system to the existing surface-level treatment facilities at the SCWRF.

22.     On December 30, 2018, less than one year after final completion of the Project, a massive and catastrophic failure event occurred at the ILS (the "ILS Incident"). The ILS Incident occurred when a gate cover for the north roller gate in the ILS ruptured and exploded upward from the concrete floor. As a result, untreated liquid sewage burst into the gate room and dry well and flooded those areas, submerging the dry well, and disabling the ILS.

8

23.     The ILS Incident caused catastrophic loss and damage to the ILS and to the County.  Because of the ILS Incident, the County was forced to take emergency measures to address this significant operations interruption, mitigate its loss and damage, and engage in recovery and remediation efforts.  For example, it took the County many months to pump out the liquid sewage and restore the ILS into a safe state so that investigations into the root cause could commence.  The County continues to address the loss and damage to the ILS, and continues to incur expense associated with it.

## TRAVELERS' INVESTIGATION AND EVENTUAL DENIAL OF THE CLAIM

24.     The County immediately provided notice to Travelers of the ILS Incident, and Travelers assigned Claim No. FDU1423 to the claim (the "Claim").  Travelers acknowledged the County's prompt notice by numerous letters and other communications.

### The County and Travelers Initial Response to the ILS Incident

25.     Due in part to the unique nature of the ILS Incident, the Claim set off a prolonged period of communication and cooperation between the County and Travelers extending three and a half years before Travelers issued a denial letter, and continuing thereafter while Travelers represented it was reconsidering its improper denial.

US1900 9482583 7

26.     The parties' investigation proceeded slowly, given the significant damage to the ILS because of the ILS Incident and unique safety concerns.  For the bulk of 2019, neither the County nor Travelers could safely get into the gate room of the ILS to physically investigate the cause of the loss.

27.     During this initial period in 2019, however, the County and Travelers accomplished what they could before physical investigations could commence. This included, but was not limited to the following:

a.)     Travelers engaged consultants to investigate the loss, and the County cooperated with these consultants, providing any and all requested documentation that was readily available and within the County's possession;

b.)     Travelers represented it had a specific claims professional within its subrogation unit who would remain involved throughout the investigation process;

c.)     Travelers represented it would cover certain of the County's costs under the Policy for the Claim;

d.)     Travelers and the County closely coordinated in 2019 on cleaning and evidence preservation activities as they worked towards getting the ILS in a state to allow for physical investigations; and

e.)     While Travelers engaged its own consultants and engineers for the investigation, it was aware the County intended to hire its own independent engineer to assist in the investigations process once the ILS was deemed safe for physical investigations.

28.     Based on Travelers' representations, its assurances of payment, and on its subrogation team's involvement and on its assurances of payment of costs, the County reasonably relied upon Travelers' conduct and representations and understood that payments would be issued on the Claim once the investigations could be completed.

## The Commencement of Physical Investigation in 2020 and Development of Testing and Evidence Protocols

29.     In late 2019, the remediation efforts put the ILS in a state safe enough to commence physical investigations. On October 23, 2019, in part to protect Travelers' subrogation rights that were being discussed with the County, the County notified the underlying critical Project participants, such as the General Contractor, ILS Subcontractor, the General Contractor's roller gate designer/supplier, Project Engineer, and Construction Manager (collectively "Stakeholders") that the County was then in a position to begin its investigations into determining the root cause of the ILS Incident.

30.     The County helped coordinate and conduct a thorough and transparent investigation and analysis of the ILS Incident that spanned multiple years.

US1900 9482583 7

Travelers repeatedly represented that it wanted the County to be responsible for the coordination with the Stakeholders to help with transparency, evidence preservation, and to protect Travelers' subrogation interests.

31.     On February 19, 2020, Travelers and its consultants, along with the numerous Stakeholders and their consultants, participated in an initial site visit to evaluate ILS and discuss the path forward for the investigation process ("Site Visit Kickoff").

32.     As part of the investigation following the Site Visit Kickoff, the County fully cooperated with all requests of Travelers, kept Travelers fully informed and provided it with a full and fair opportunity to participate in all activities, including, but not limited to, providing recurring site access to it and its consultants, continued production of voluminous amounts of relevant Project documentation, ILS and investigation documentation, and provided the opportunity to jointly develop investigation, evidence, and testing protocols of which Travelers actively participated.

33.     Travelers had significant input into and jointly developed investigation, evidence, and testing protocols (the "Protocols") to which the County coordinated finalization of the same through the numerous Stakeholders. The County, the Stakeholders and Travelers agreed that certain critical investigation activities would not commence until the Protocols were finalized.

US1900 9482583 7

Given the continued input demanded by numerous Stakeholders, including

Travelers, the Protocols were not finalized until late 2020.

34.     During the summer and fall of 2020, Travelers and its consultants

continued to request numerous documents and information from the County and

Stakeholders, and the County fully cooperated and complied with these requests.

In connection with its requests, Travelers continued to represent that its

investigation and research was ongoing, and that Travelers could not complete its

final coverage determination until it was satisfied with the state of the

investigations and the County discharged its duties under the Policy.

35.     For example, on August 11, 2020 and October 19, 2020, Travelers

sent letters to the County (a) requesting voluminous documents; (b) asking that the

County ensure that the interests of all parties (i.e. Stakeholders) shall be addressed

in a fair and equitable manner, which related, in part, to Travelers' future

subrogation rights; (c) describing its opinions on future activities and

investigations tied to the Protocols; and (d) emphasizing the County's duties under

the Policy including those found in the Policy Conditions, Additional Provisions

and Definitions Form, page 10 of 18, Sections B.3.a. (4), (5), (6) and (8), all of

which Travelers asserted were conditions on a final coverage determination.

36.     On November 17, 2020, after months of negotiations with the

Stakeholders and Travelers, the County issued the final agreed Protocols, inclusive

of the site investigation and coordination protocol, which would allow for certain close-up examinations of the relevant Gate Room to take place in December 2020. Travelers knew and understood that the Protocols and physical investigations activities were only in the beginning phases in December 2020 with issuance of the Protocols.

37.     In 2020, based on the General Contractor's incorrect position concerning substantial completion of the Project, the effect of which could result in expiration of the six-year statute of limitations in December 2020, the County approached the Stakeholders about entering into a tolling agreement.  Given its subrogation interests, the County kept Travelers fully informed of these communications, including over multiple teleconferences.  For example, on August 20, 2020, the County sent Travelers – following a teleconference on this subject – a copy of the then draft version of a tolling agreement ("Tolling Agreement") and reiterated its request for input from prior discussions on the same.

38.     In connection with discussions surrounding the Tolling Agreement, Travelers stated:

a.)     It was coordinating the discussions involving the Tolling Agreement with the Travelers' subrogation team and other counsel;

b.)     Travelers' involvement in any tolling agreement was premature until the investigation could be fully completed, the County discharged its

14

duties and fully complied with the terms of the Policy, and the investigation was only in the early stages given the unique nature of the ILS Incident and clean-up efforts;

c.)   Travelers' involvement in any tolling agreement was premature because it needed the County to first comply with provisions in the Policy, including Policy Conditions, Additional Provisions and Definitions Form, page 10 of 18, Sections B.3.a. (4), (5), (6) and (8), all of which Travelers asserted were conditions on a coverage determination by Travelers;

d.)   Travelers' involvement in any tolling agreement was unnecessary because, once payment on the Claim occurred, Travelers would step in the shoes of the County with subrogation and was protected; and

e.)   Travelers reassured the County that Travelers and the County were not adverse, and their interests under the Policy and in the investigation process were aligned.

39.   The Tolling Agreement was nearly finalized by December 2020, and the County and Travelers held a call on December 7, 2020, in which Travelers reinforced its prior representations and again stated any tolling agreement with Travelers was premature until the investigations could be completed and a final coverage determination was made; and reiterated that it had coordinated with its

15

subrogation team and was comfortable with the County finalizing the Tolling

Agreement because, once payment on the Claim occurred, Travelers would step

into the shoes of the County for its rights against the Stakeholders.

40.     The County relied on the representations discussed in Paragraphs 38

and 39 in connection with finalizing the Tolling Agreement with the Stakeholders,

and otherwise, and Travelers never retracted any of these representations.

### The Investigation Continues in 2021, the County requests Travelers' Coverage Position

41.     In 2021, the investigations continued to ramp up significantly, as

Travelers and its consultants continued to actively drive portions of the

investigation, notwithstanding delays caused by the Stakeholders, of which

Travelers was aware.  For example, Travelers and its consultants visited the ILS

site additional times in 2021 and participated in testing at the County consultant's

office in Chicago in the late spring and summer of 2021.  Additional Protocols

were also developed in 2021 by and among the County, Travelers and the

Stakeholders related to additional testing processes and evaluation procedures for

the investigations.

42.     During this same timeframe in 2021, Travelers requested that the

County provide cost support for its losses to Travelers' forensic cost analyst, to

allow damages and costs assessment to be commenced for payment under the

Policy.

43.    In reliance on Travelers' request, and with a reasonable expectation that payments would be made based upon this information, the County worked diligently to compile its substantial loss support.  On April 8, 2021, the County sent a voluminous amount of documents supporting its losses to Travelers and its forensic cost analyst.

44.    Additional cost information would be provided to Travelers, at Travelers' request and with the expectation of payment, on October 19, 2021 and, again on March 15, 2022.

45.    On June 1 and 2, 2021, Travelers issued new requests for documents and information it claimed were needed to help complete the investigation.  On June 15, 2021, the County and Travelers held a conference call to discuss the latest requests, at which Travelers' representative admitted his engineers were asking for too much information and promised to refine the requests to something more manageable.

46.    During the week of June 21, 2021, metallurgical and related testing took place in Chicago, Illinois accordance with the agreed Protocols, with Travelers' attendance.  On August 2, 2021, the County provided Travelers with the June 2021 testing information, along with additional information that was previously shared.

47.     On August 20, 2021, Travelers, with its counsel, had a call with the County to discuss the progress made by the County's consultants on their preliminary findings, and the status of Travelers' ongoing investigation.  On this call, Travelers again represented that the County and Travelers were not adverse, but Travelers needed additional testing and information to complete its investigation and issue a coverage determination under the Policy.

48.     After the County expressed frustration with the length of time the investigation was taking, Travelers sent another investigation status letter on September 14, 2021.  Among other things, the letter:

a.)     acknowledged the County's growing frustration with the length of the investigation, which had been ongoing for over two and half years;

b.)     asked that the County "keep in mind this is an extremely complex investigation involving complex 'one-of-a-kind' engineering and construction methods and materials";

c.)     represented that Travelers was doing its best to move the investigation forward, in an effort to soon be in a position to make a coverage determination;

d.)     represented it and its engineering team needed more data and documents to complete its investigation; and

US1900 9482583 7

e.)     re-emphasized the County's duties under the Policy including those found in the Policy Conditions, Additional Provisions and Definitions Form, page 10 of 18, Sections B.3.a. (4), (5), (6) and (8).

49.     On September 15, 2021, Travelers sent a draft Common Interest Agreement to the County, whereby Travelers reiterated in the draft that the parties shared a common interest in the potential prosecution, settlement and outcome of any proceedings related to pursuing rights and claims against any parties responsible for the Claim. This draft Common Interest Agreement was consistent with Travelers' continued representations that any litigation was premature until the investigations were complete and further confirmed Travelers took the position the parties were not adverse.

50.     On October 15, 2021, the County sent a letter to Travelers documenting the history of the investigation and requesting confirmation of coverage, loss calculations and a demand for payment. Travelers did not dispute any of the content in the October 15, 2021 letter, but did request certain limited clarifications to it. On October 25, 2021, the County provided those limited clarifications, which included confirmation that the County agreed with Travelers' continued representations that the parties' interests were still not adverse.

US1900 9482583 7

51.     Given Travelers' continued representations, the County continued to cooperate and comply with the requests from Travelers, including its requests that the County provide cost backup to Travelers' forensic cost consultant.

52.     From the beginning of their communications about the Claim, the County reasonably believed it would receive payment from Travelers under the Policy, and relied on Travelers' communications and other conduct in connection with Travelers' adjustment and payment of the Claim.

### Travelers' May 17, 2022 Denial of Coverage, and the County's Response

53.     While the County was in initial discussions with the General Contractor and Stakeholders surrounding liability for the ILS Incident, Travelers continued its investigation into 2022.  In the first quarter of 2022, the County continued to provide further information in response to Travelers' requests, and the County repeatedly requested updates regarding the status of Travelers' investigation.  In response, Travelers continually promised that the coverage determination was coming imminently.

54.     On March 17, 2022, Travelers stated that its engineering team had completed its investigation, and Travelers was waiting on the final report.  After additional delays occurred and the County continued to request updates, on April 25, 2002, Travelers' representative stated that Travelers was awaiting final

approval from its attorney before issuing its coverage position and final report by
its consultants.

55.     On May 10, 2022, the County again expressed its disappointment with
the delays.  In particular, the County noted that it "recognize[ed] the unique nature
of the investigation associated with its claim.  As such, the County has cooperated
fully and worked lock-step with Travelers and its team, providing voluminous
amounts of information along the way.  The County has relied on those joint
efforts and understood Travelers would promptly pay for the covered losses."

56.     On May 17, 2022, Travelers issued its coverage determination, which
denied the claim in total, attaching an 82-page engineering report concluding that
the General Contractor's construction and delegated design work was defective.  A
copy of the May 17, 2022 letter is attached as **Exhibit B.**  Travelers' May 17, 2022
letter contained a superficial discussion of the Policy as applied to the ILS incident.
In addition, Travelers cited certain exclusions in the Policy as grounds for denying
coverage, including Exclusions D.2.c. and D.3.c. above, but failed to analyze the
"give-back" language in each exclusion that specifically covers the County's loss
and damages here, in the event either exclusion applies.  *See, e.g.,* Exclusion D.3.c.
("[I]f an excluded cause of loss … results in a Covered Cause of Loss, this
exclusion does not apply to loss or damage caused by that resulting Covered Cause
of Loss."); Exclusion D.2.c. ("[I]f an excluded cause of loss … above results in a

21

'specified cause of loss' …, the Company will pay for the loss or damage caused by that "specified cause of loss" ….).  In addition, Travelers purported to rely on the Pollution Exclusion in the Policy, a plainly frivolous position.

57.     The County was surprised and disappointed with Travelers' letter as it related to coverage, which was inconsistent with Travelers' prior statements concerning the Claim.  On May 23, 2022, the County sent an email expressing its disappointment in Travelers' coverage positions, and informing Travelers it was evaluating the next steps, considering the County's ongoing discussions with the Stakeholders about their liability.

58.     On May 27, 2022, the County and Travelers held a call discussing Travelers' May 17, 2022 letter, and the status of the early stages of the County's structured negotiations with the General Contractor, at which point the County raised the possibility of a tolling agreement between Travelers and the County now that Travelers denied the Claim and completed its investigation, and in light of the County's claims against the Stakeholders and the length of time it could take for those claims to resolve.  In June, July and August 2022, and January 2023, the County and Travelers exchanged versions of cooperation and tolling agreements, but ultimately did not sign such an agreement.  At no point during these exchanges did Travelers cite to or purport to rely on any limitations provision in the Policy.

59.     On December 16, 2022, as it had promised previously, the County sent a detailed letter contesting Travelers' coverage denial, providing additional information, and requesting that Travelers reconsider its denial.  Attached hereto as **Exhibit C** is a copy of this letter.  Among other things, the County explained in its December 16, 2022 letter that, even assuming application of Exclusions D.2.c. and D.3.c., as Travelers contended, the "give-back" language in those exclusions provided coverage, particularly given the Flood Endorsement and "water damage" language in the Policy.  The County also explained that Travelers' purported reliance on the Pollution Exclusion was baseless.

60.     Contemporaneous with its December 16, 2022 letter, the County requested a call with Travelers in light of the upcoming January 2023 expiration of the Stakeholder/County Tolling Agreement and the structured negotiations process. On January 27, 2023, the County had another call with Travelers and its counsel, in which the parties agreed Travelers would focus on responding to the December 16, 2022 reconsideration letter before addressing any cooperation and tolling agreement.  During this call and in a confirming email on January 30, 2023, the County stated that it continued to expect reimbursement by Travelers under the Policy.

61.     On January 30 2023, the County filed a Lawsuit against the General Contractor in the Superior Court of Cobb County under Civil Action No. 23100779

(herein "Stakeholder Litigation").  The County asserted claims for, among others, breach of contract, contractual indemnity, breach of good faith and fair dealing, and attorney's fees, all of which could exceed $39 million.  Numerous Stakeholders have been joined in the suit, which is in the early stages of discovery.

62.     Travelers delayed its response to the County's December 16, 2022 letter for a prolonged period, despite repeated requests from the County.  The County repeatedly updated Travelers on the status of the Stakeholder Litigation as it waited on Travelers' reconsideration of its coverage positions.

63.     On September 15, 2023, after a nearly nine-month delay, Travelers issued its response to the County's December 22, 2022 letter, reiterating its coverage denial.  A copy of this letter is attached as **Exhibit D.**  In its September 23, 2023 letter, Travelers reiterated its prior, unfounded grounds for denial of coverage in certain areas while failing to address all of the points raised by the County.  For example, Travelers relied principally on Exclusion D.2.c., which, as described above, includes "give-back" language that covers the County's loss.  However, Travelers abandoned reliance on Exclusion D.3.c., which contains different "give-back" language even more favorable to the County than the language in Exclusion D.2.c.  In addition, Travelers continued to rely on the Pollution Exclusion, also a frivolous position.

64.     After receipt of the September 15, 2023 letter, the County requested a meeting to verbally address its extreme concern with Travelers' positions denying coverage, notwithstanding the plain language in the Policy, including the broad coverage grant and the "give-back" language in the referenced exclusions.  This meeting was held on October 27, 2023, and attended by the principal Travelers adjuster in person, and remotely by two senior Travelers representatives, including counsel.

65.     On November 8, 2023, in response to Travelers' request that the County provide Georgia case law supporting the County's positions regarding coverage under the Policy, while not required to do so, the County provided such examples of Georgia case law.  A copy of this letter is attached as **Exhibit E.**

66.     On December 12, 2023, Travelers responded to the County's November 8, 2023 letter, reiterating its coverage denial, without citing a single Georgia case.  In addition, *for the first time and nearly five years after notice was provided*, Travelers stated it was "reserving rights" under a two-year suit limitation provision in the Policy.

67.     The two-year suit limitation provision had never been referenced by Travelers in any prior correspondence or communications since the outset of the Claim, whether by reservation of rights or otherwise.  Further, no representative of Travelers, including counsel, ever raised the two-year suit limitation provision

during any call or conversation with the County.  This new "reservation" was directly inconsistent with Travelers' conduct, statements in writing, representations, and requests and directives to the County over the previous five years.  The County reasonably relied on Travelers' conduct and representations as summarized throughout this complaint further to the County's clear understanding that Travelers would not rely on any limitations provision in the Policy, i.e., it had been waived.

68.     Further, to the extent Travelers intends to rely on the two-year suit limitation provision (which is not a standalone provision, but instead contains certain conditions) as a defense to coverage, then Travelers' conduct and statements, including without limitation as described herein, reflect Travelers' intent to deceive the County, or otherwise constituted gross negligence so as to amount to constructive fraud, by which the County has been misled to its injury.

### The County's Statutory Bad Faith Demand

69.     On January 9, 2024, in response to Travelers' December 12, 2023 letter, the County served a notice pursuant to O.C.G.A. § 33-4-6 on Travelers, demanding that Travelers reimburse the County for its losses, or face statutory remedies for bad faith under Georgia law.  A copy of the notice dated January 9, 2024 is attached as **Exhibit F**.  Among other things, the County stated that Travelers

provided no reasonable explanation for why coverage does not attach under the plain language of the extremely broad, "All Risk"' Policy it sold to the County, particularly where the cause of the loss is not in substantial dispute. Nor has Travelers cited a single Georgia case supporting its denial of coverage, including Travelers' position that the "clawback" language in certain exclusions do not apply, in response to the County's Georgia authority supporting its claim.

Ex. F, p. 1.

70.    On February 27, 2024, Travelers sent a response to the County's bad faith demand, which contained false and misleading statements concerning the history of the Claim, and did not otherwise provide a reasonable rationale for Travelers' continued denial of the County's Claim based on Georgia law.

71.    Notwithstanding the County's January 9, 2024 letter, Travelers has failed and refused to pay the amount demanded by the County. Accordingly, the County brings a claim for bad faith pursuant to O.C.G.A. § 33-4-6, described below.

## CAUSES OF ACTION

### COUNT I
### (Breach of Contract)

72.    The County incorporates by reference paragraphs 1 through 71 of this Complaint as though fully set forth herein.

73.    The SCWRF, including the ILS and the contents therein, constitute Covered Property under the Policy, and the County has incurred significant losses and damages in accordance with the terms of the Policy.

27

74.     Travelers had and has a duty to indemnify the County under the Travelers Policy to pay the County for, among other things, "direct physical loss of or damage to Covered Property caused by a Covered Cause of Loss," as well as for Covered Costs and Expenses in connection with the ILS Incident, and other damages, costs and expenses in accordance with the terms of the Policy.

75.     In particular, certain exclusions, such as Exclusions D.2.c. and D.3.c., described above, contain "give-back" language providing coverage where an excluded cause of loss "results in" a "Covered Cause of Loss" or a "specified cause of loss."  In that event, the Policy covers loss or damage caused by that "Covered Cause of Loss" or "specified cause of loss."  The definitions of the phrases "Covered Cause of Loss" and "specified cause of loss" are expanded in the Policy by, for example, the "Flood" Endorsement and the term "water damage."  Thus, to the extent Exclusions D.2.c. or D.3.c. apply, as Travelers contends, coverage is still afforded under the "give-back" language.

76.     The County has complied with all applicable conditions contained in the Travelers Policy, and/or those conditions have been waived or Travelers is estopped or otherwise precluded from relying on them.  Additionally, none of the exclusions, conditions or limitations in the Policy operate to preclude Travelers' duty to reimburse the County for its losses under the Policy.

77.     By refusing to honor its obligation to indemnify the County in connection with the ILS Incident, Travelers has materially breached its obligations under the Travelers Policy.

78.     As a direct and proximate result of Travelers' breach, Travelers has deprived the County of the benefit of the Travelers Policy, for which the County paid substantial premiums, and has caused the County to incur significant legal fees and expenses.

79.     The County has been damaged in an amount to be proven at trial, including without limitation the damages, costs, and expenses it has incurred and continues to incur for the physical loss or damage from the ILS Incident, plus interest and other appropriate damages.

## COUNT II
### (Violation of O.C.G.A. § 33-4-6)

80.     The County incorporates by reference paragraphs 1 through 79 of this Complaint as though fully set forth herein.

81.     On January 9, 2024, the County served a notice pursuant to O.C.G.A. § 33-4-6 on Travelers, demanding that Travelers reimburse the County for its losses, but Travelers has refused to do so after the passage of more than sixty (60) days from receipt of this notice.

82.     Travelers has, in bad faith, refused to reimburse the County for any of the County's losses in connection with the ILS Incident.  Among other things,

Travelers' frivolous and unfounded refusal in law or in fact to pay according to the terms of the Policy subjects Travelers to the remedies described in O.C.G.A. § 33-4-6.

83.     Accordingly, the County is entitled to the statutory remedies described in O.C.G.A. § 33-4-6, which include without limitation statutory damages equal to not more than fifty (50) percent of the liability of Travelers, along with the County's attorneys' fees for the prosecution of this action, and other appropriate remedies.

## COUNT III
### (Common Law Bad Faith)

84.     The County incorporates by reference paragraphs 1 through 83 of this Complaint as though fully set forth herein.

85.     Under Georgia law, every contract contains an implied covenant or duty of good faith and fair dealing in the performance of the agreement, and this applies to insurance policies.

86.     Accordingly, Travelers owed the County an implied duty of good faith and fair dealing in Travelers' performance of its obligations under the Policy.

87.     Travelers breached its duty of good faith and fair dealing by, as described above and without limitation, repeatedly misleading the County into believing Travelers was giving careful consideration to the County's Claim (while demanding that the County discharge enumerated duties under the Policy), and that

US1900 9482583 7

all or at least a portion of the Claim would be paid on a timely basis.  After

abruptly failing to pay the Claim, upon reconsideration Travelers failed to fairly

apply the plain language of the Policy or Georgia law, and purported to rely on and

cite provisions and defenses to payment that unambiguously do not apply, or had

been waived, or upon which Travelers was estopped to rely.  Through its conduct,

Travelers has failed to give the County's interest with respect to the Claim the

same faithful consideration it gave its own – elevating its own interest over those

of the County – and causing the County substantial prejudice and damages with

respect to the County's attempt to recover for the Claim.

88.     Travelers' breach of the duty of good faith and fair dealing has

directly and proximately caused the County to be damaged in an amount to be

proven at trial, plus interest and other appropriate damages.

## COUNT IV
## (Declaratory Judgment)

89.     The County incorporates by reference paragraphs 1 through 88 of this

Complaint as though fully set forth herein.

90.     Travelers owes a duty to indemnify the County for the loss the County

has incurred resulting from the ILS Incident.

91.     Travelers' failure to indemnify the County for this loss constitutes a

material breach of Travelers' duties and obligations under the Travelers Policy.

US1900 9482583 7

92.     In light of the above, there exists a "case of actual controversy" between the parties appropriate for the entry of a declaratory judgment pursuant to 28 U.S.C. 2201, in the County's favor.

93.     The County is entitled to a declaration that Travelers has a duty to indemnify the County for the full amount of its loss under the Travelers Policy; that Travelers breached the Travelers Policy; that Travelers owes the County amounts to be determined by the Court; and other declarations of Travelers' obligations under the Travelers' Policy, as determined by the Cout.

## **PRAYER FOR RELIEF**

WHEREFORE, Cobb County respectfully seeks the following relief:

A.     That the Court enter judgment in favor of the County on all causes of action;

B.     On the County's First Cause of Action, an award of damages in the County's favor in an amount to be determined at trial;

C.     On the County's Second Cause of Action, pursuant to OCGA § 33-4-6, additional statutory damages of not more than fifty (50) percent of Travelers' liability, attorney fees, costs, and other damages permitted by statute.

D.     On the County's Third Cause of Action, an award of damages in the County's favor in an amount to be determined at trial;

E.     On the County's Fourth Cause of Action, a declaration that (a) Travelers materially breached the Travelers Policy; (b) Travelers has an obligation to pay the County under the Travelers Policy; and (c) other declarations of Travelers' obligations under the Travelers' Policy, as determined by the Court;

F.     On all causes of action, an award of the County's reasonable attorneys' fees, pre-judgment and post-judgment interest, costs and the expenses of this action;

G.     On all causes of action, for such other, further and different relief as this Court deems just and proper; and

H.     That this case be tried by a jury.

## JURY TRIAL DEMAND

Cobb County hereby demands a trial by jury of all issues so triable.

Dated:  May 8, 2024

Respectfully submitted,

/s/Brent W. Brougher
Brent W. Brougher GA Bar 086373
*bbrougher@kilpatricktownsend.com*
Joe P. Reynolds GA Bar 358795
*jreynolds@ktslaw.com*
Kristen P. Green GA Bar 635927*
*\*application for admission pending*
*kgreen@ktslaw.com*

US1900 9482583 7

**KILPATRICK TOWNSEND &STOCKTON LLP**
1100 Peachtree Street, Suite 2800
Atlanta, GA  30309
Tel. (404) 815-6500
Fax (404) 815-6555

*Attorneys for Plaintiff*